UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
TERRENCE P. SCHOUENBORG,

                   Petitioner,

                                        MEMORANDUM & ORDER

      -against-                       08-CV-2865(JS)

SUPERINTENDENT, AUBURN CORRECTIONAL
FACILITY,

                   Respondent.
----------------------------------X
APPEARANCES
For Petitioner:      Richard W. Levitt, Esq.
                    Law Offices of Levitt & Kaizer
                    40 Fulton Street, 23rd Floor
                    New York, NY 10038

For Respondent:      Michael J. Brennan, Esq.
                    Edward A. Bannan, Esq.
                    Suffolk County District Attorney's Office
                    200 Center Drive
                    Riverhead, NY 11901

SEYBERT, District Judge:

        On January 27, 2005, following a jury trial in the County Court of Suffolk County, pro se Petitioner Terrence Paul Schouenborg ("Petitioner") was convicted of two counts of Sodomy in the First Degree in violation of New York Penal Law § 130.50(1); two counts of Sodomy in the Second Degree in violation of New York Penal Law § 130.45(1); four counts of Sexual Abuse in the Second Degree in violation of New York Penal Law § 130.65(1); and three counts of Endangering the Welfare of a Child in violation of New York Penal Law § 260.10(1). On June 16, 2005, following a hearing pursuant to Section 400.21 of New York Criminal Procedure Law,

1

Petitioner was sentenced as a persistent felony offender to an indeterminate term of imprisonment of twenty-two years to life for each of his convictions for Sodomy in the First Degree; an indeterminate term of imprisonment of twenty years to life for each of his convictions for Sodomy in the Second Degree and Sexual Abuse in the First Degree; and one year of imprisonment for each of his convictions for Endangering the Welfare a Child. The sentences were imposed concurrently.

Presently before the Court is Petitioner's Petition for a Writ of Habeas Corpus (the "Habeas Petition") pursuant to 28 U.S.C. § 2254 ("Section 2254"), including a supplemental brief submitted in support of the Habeas Petition. (Docket Entry 34.) For the reasons that follow, the Habeas Petition is DENIED.

<u>BACKGROUND</u>

I.   <u>The Underlying Facts</u>

On September 16, 2003, thirteen-year-old SV,[1] a female student in the eighth grade, went to Tanner Park in Copiague, New York with two friends, LJ, also a female student, and JP, a male student. LJ subsequently left the park to return home. (Trial Tr., Docket Entry 24, at 591:12-602:16[2].) SV and JP remained at

---

[1] Due to the minority ages of SV, LJ, and JP at the time of the incident, they are identified only by their initials.

[2] Pages 1-768 of the Trial Transcript can be found at Docket Entry 24 and pages 769-1497 can be found at Docket Entry 124-1.

the park, where a man who had just parked his vehicle approached them and asked if they had "rolling papers." (Trial Tr. 719:21-720:12.) JP answered in the negative and the man went back to his car and drove away. (Trial Tr. 720:13-721:9.)

Forty-five minutes to an hour later, the man returned and asked SV and JP if they wanted to smoke. (Trial Tr. 721:12-722:9.) SV said she would, and SV and JP got into the man's car. (Trial Tr. 722:11-15.) SV testified that it was still light out when she and JP got into the car. (Trial Tr. 609:22-24.) The driver identified himself as Paul or Paulie, told the two teenagers that he was twenty-seven years old, and said that he grew up in the Bronx. (Trial Tr. 610:19-20, 723:18-24.) The three of them drove around, drank beer, and smoked cigarettes. (Trial Tr. 724-28.) The record reflects that the driver dropped JP off near his home, likely around 8 p.m. (Trial Tr. 620:12-23, 729:4-11.) Once JP left the car, the man drove around, ultimately parking the car in front of a flower shop. (Trial Tr. 622:5-635:10.) After the car was parked, the man climbed into the rear seat and sexually assaulted and sodomized SV. (Trial Tr. 622:5-635:10.)

Following the assault, SV climbed into the front seat and was able to escape from the vehicle. (Trial Tr. 636:25-637:20.) She ran to LJ's home where the police were called. (Trial Tr. 637:24-639:5.)

## II.  The Investigation

Police Officer Sonia Martinez arrived at LJ's home at approximately 11:00 p.m.  (Trial Tr. 561:4-11.)  SV told Officer Martinez that the assailant was a "white Hispanic-looking male," in his late twenties.  (Trial Tr. 574"3-575"12.)  SV described the assailant as having a mustache, a beard, and blue eyes.  In addition, she said he was driving a white vehicle with black lettering on the side.  (Trial Tr. 580:23-581:18.)

Two Detectives subsequently arrived, including Detective Joseph Brittelli, who took control of the investigation.  (Trial Tr. 683:13-685:5.)  SV again stated that her attacker had blue eyes and a mustache, but also stated that he "looked like a white and black Puerto Rican," or someone of mixed race.  (Trial Tr. 685:21-686:2.)  SV drove around with the detectives and showed them the location of her assault, the parking lot of a florist shop.  (Trial Tr. 801:23-802:12.)  SV indicated that her attacker discarded a cigarette butt, and the detectives located and retrieved one for forensic testing.  (Trial Tr. 802:19-803:3.)  The detectives also sent a Marlboro Lite butt that SV's assailant placed in SV's purse to the lab for testing.  (Trial Tr. 853:13-854:6.)

The detectives then transported SV to the Sexual Assault Nurse Examiner ("SANE") at Good Samaritan Hospital for

examination. (Trial Tr. 808:6-14.) The SANE nurse photographed SV's injuries, took swabs of fluids and other evidence from her vaginal and anal areas, and collected a urine sample. (Trial Tr. 1021-61.) Detective Brittelli gathered all of the evidence from the examination and sent it to the Suffolk County Crime Lab. (Trial Tr. 852:6-19.) He attempted to take a statement from SV after her examination, but she was too tired to cooperate at that time. (Trial Tr. 814:2-19.)

On September 29, 2003, Detective Brittelli obtained SV's statement. (Trial Tr. 816:5-10.) This statement, along with JP's statement, led to the arrest of Petitioner on October 23, 2003, at which time they seized Petitioner's vehicle and searched it for evidence. (Trial Tr. 829:19-830:24, 863-870:16.)

III. The Lineup and Wade Hearing

On October 13, 2003--10 days before Petitioner's arrest--Detective Brittelli showed SV a photo array that included photos of Petitioner and five other "white males all similar in appearance." (Trial Tr. 69:16-73:12.). SV identified the photo of Petitioner as her attacker. (Trial Tr. 76:3-24.)

On October 23, 2003, the day of Petitioner's arrest, police prepared a lineup for SV to view at the First Precinct in West Babylon, New York. (Trial Tr. 78:4-22, 875:21-876:9.) The lineup was comprised of Petitioner and four other "fillers," who were police officers. (Trial Tr. 83:17-87:7.) Detective Brittelli

testified that he advised SV that "she was going to look at five males, all similar in appearance" and "if she recognized someone, she was to tell [Detective Brittelli] what number he was and why she recognized him." (Trial Tr. 85:3-8.) SV viewed two lineups. Each time the participants were rearranged and each time SV positively identified Petitioner as the assailant. (Trial Tr. 650:9-651:17, 889:7-891:22.) Detective Brittelli testified that SV identified Petitioner "almost immediately" upon viewing each lineup. (Tr. 116:20-117:4.) On August 30, 2004, JP also viewed a lineup which included Petitioner, but he was unable to identify any of the six men.[3] (Trial Tr. 730:13-20.) Ultimately, the Court allowed the jury to hear about the lineups during the trial. (See Trial Tr. 650-52.)

IV.  Trial Testimony Regarding the Lineups

At trial, the prosecutor asked SV a number of questions about the lineups she viewed. After discussing when and where the lineups took place, the following exchange occurred:

Q. And what, if any, instructions did the detective give you at that point?

A. "There's going to be five men standing. And you're going to have to pick one. And why do you recognize him."

Q. [SV], did the detective tell you you're going to have to pick one?

---

[3] During trial JP was, however, able to identify a picture of Petitioner's vehicle as the vehicle he and SV entered on September 16, 2003. (Trial Tr. 729:19-730.)

A. Yes.  No.

Q. What did the detective say to you, [SV]?

A. "That there's going to be five men.  And you're going to have to" -- I forgot.

Q. [SV], did the detective tell you that you would have to pick one of the men?

A. I think so.

(Trial Tr. 648:19-649:8.)  When the prosecutor tried to go over the same ground again, defense counsel objected and the objections were sustained.  However, the following additional exchange also occurred:

> THE COURT: [SV], tell us to the best of your recollection what happened from the time you got to the precinct.  Run through it in your mind.  You said you went downstairs. Right?
>
> THE WITNESS: Yes.
>
> THE COURT: Take it from there.  What happened when you went downstairs?
>
> THE WITNESS: He told me to wait a little bit.
>
> THE COURT: You got to speak into that microphone.
>
> THE WITNESS: He told me to wait a little bit. And he told me to come in. And he told me, "There's going to be five men. And you're going to have to see all of them. And you're going to have to pick one of them out. And you're going to have to recognize him."

(Trial Tr. 649:20-650:15.)  Although defense counsel revisited the instructions that SV received during the lineups on cross-

examination, defense counsel never moved to reopen the <u>Wade</u> hearing based upon SV's testimony. (Trial Tr. 699.)

V.  <u>Additional Evidence Presented at Trial</u>

SV testified at trial and identified Petitioner as the assailant in court. (Trial Tr. 636:11-25.) In addition, the prosecution pointed to SV's lineup identifications of Petitioner to corroborate SV's in-court identification. (<u>See</u> Tr. 650-651:17.) The prosecutor also pointed to circumstantial evidence implicating Petitioner in the crime. For example, SV said in her statement to Detective Brittelli that the assailant told her he worked at a pizza shop called "the Merrick something Pizza," and it was determined that the Petitioner worked at a restaurant called Tomato & Basil Restaurant Pizzeria located on Merrick Road (Tr. 830:9, 855:15-17, 901:18-24); SV testified that the assailant said that he "was going to be fishing" and fishing gear was found in Petitioner's trunk (Tr. 611:13-19, 832:9-15); SV testified that the assailant told her his name was Paul, which is Petitioner's middle name (Tr. 610, 705-706); and SV testified that a bag that was removed from Petitioner's car looked similar to the one she saw the night she was assaulted. (Tr. at 653:13-22.) In addition, JP testified that the assailant said he grew up in the Bronx and the prosecutor pointed to the Petitioner's birth certificate which indicated that Petitioner was born in the Bronx. (Trial Tr. 723:18-19, 1393:6-13.) Finally, the prosecution focused on

Petitioner's car, which JP described as a white Oldsmobile with a blue interior and positively identified as Petitioner's car at trial. (Trial Tr. 722:21-23, 730:3-12.)

During the trial, defense counsel focused on the inconsistencies in SV's version of events on the night of the incident. Specifically, defense counsel argued that SV identified the wrong man. (Trial Tr. 552-553.) He noted that, at various times, SV described the assailant as white, Hispanic, Puerto Rican, and black. (Trial Tr. 685:11-688:10, 927:8-24.) SV also testified on cross-examination that Petitioner's first name, "Terrance," was the same name as "Paul." (Trial Tr. 705:11-706:7.) In addition, she testified that police told her at one point that the perpetrator was Italian, when she previously described him as Puerto Rican. (Trial Tr. 688:4-10.) Furthermore, during her various interviews with police, SV failed to mention that the assailant had any tattoos, despite the fact that Petitioner has multiple tattoos, and SV gave varying descriptions of the assailant's clothing. (Trial Tr. 920-926:2, 932:14-933:15.) In addition, SV's description of the vehicle she entered that night did not include what defense counsel characterized as a distinctive sticker on the back window of Petitioner's vehicle or a distinctive steering wheel. (Trial Tr. 915:8-919:3.) There were also several inconsistencies between JP and SV's testimony. For example, JP testified that SV smoked marijuana with the assailant and SV denied

smoking marijuana. (Trial Tr. 722:4-12, 681:6-9.) And JP testified that he asked SV if she wanted to come with him when he exited the car, but SV denied that JP made that overture. (Trial Tr. 621-622, 735.)

The prosecution elicited extensive testimony about the physical evidence recovered from SV and from Petitioner's vehicle. Both the exterior and interior of Petitioner's vehicle were dusted for fingerprints, but none were found. (Trial Tr. 939.) The vehicle was also tested for SV's blood because she told Detective Brittelli that she had bled into her hand and wiped her blood in the car. (Trial Tr. 926:3-927:7.) Police did not find any evidence of SV's blood in the vehicle. (Trial Tr. 941:2-943:11.) Moreover, hair and fibers that were recovered from SV's clothing were not consistent with Petitioner's vehicle. (Trial Tr. 1195:25-1197:11.) Hairs and fibers recovered from the floor mats, seat fabric, and clothing found in the back seat and trunk of Petitioner's vehicle were either inconsistent with SV or unusable for testing and comparison. (Trial Tr. 1197:12-1199:24.) On the basis of this testing, Clyde Wells, an expert in the field of hair and fiber analysis from the Suffolk County Crime Lab, determined that he could not conclusively place or exclude SV from being in Petitioner's car. (Trial Tr. 1205-06.) On cross-examination, defense counsel elicited that although animal hair was recovered

from many areas in Petitioner's vehicle, no animal hair was found on SV. (Trial Tr. 1208:15-25.)

Ann Juston, a DNA expert from the Suffolk County Crime Lab, testified that DNA taken from a semen-stained shirt found in Petitioner's car was insufficient in size to obtain a complete DNA profile. (Trial Tr. 1261:25-1263:15.) However, the sample was large enough to test for a partial DNA profile, which was consistent with Petitioner's DNA and the DNA of at least two other people. (Trial Tr. 1262:21-24.) Ms. Juston also testified that SV could not be excluded as a contributor of the DNA. (Trial Tr. 1262:24-1263:4.)

After deliberation, the jury convicted Petitioner on all counts. (Trial Tr. 1484-1488.)

IV. <u>Sentencing</u>

On June 16, 2005, following a hearing pursuant to New York Criminal Procedure Law Section 400.21, Petitioner was sentenced as a persistent felony offender to an indeterminate term of imprisonment of twenty-two years to life for each of his Sodomy in the First Degree convictions; an indeterminate term of imprisonment of twenty years to life for each of his convictions for Sodomy in the Second Degree and Sexual Abuse; and one year of imprisonment for each of his Endangering the Welfare a Child convictions. The sentences were imposed concurrently.

V.   Procedural History

    Petitioner's direct appeal raised five grounds.  First, that the trial court abused its discretion by allowing the testimony of the DNA expert who could only testify that the DNA evidence was inconclusive.  Second, that the court further abused its discretion by allowing Petitioner's two-year-old driver's license photograph, which depicted Petitioner with facial hair, into evidence.  Third, that the prosecutor engaged in prosecutorial misconduct during her summation by making statements which improperly shifted the burden of proof onto Petitioner and improperly vouched for witness credibility.  Fourth, that the evidence was insufficient to prove his guilt beyond a reasonable doubt.  Fifth, that the sentence imposed were harsh and excessive. The Appellate Division, Second Department, affirmed both the conviction and sentence.  People v. Schouenborg, 42 A.D.3d 473, 840 N.Y.S.2d 807 (2d Dep't 2007).  Petitioner sought leave to appeal, which was denied.  See People v. Schouenborg, 9 N.Y.3d 926, 875 N.E.2d 900, 844 N.Y.S.2d 181 (N.Y. 2007).

    Petitioner filed his Habeas Petition on July 15, 2008. Following the submission of additional briefs, the Court issued an opinion on September 30, 2013 denying the majority of Petitioners claims as either procedurally barred or meritless; staying the case while Petitioner sought to exhaust his claim for ineffective assistance of appellate counsel in state court; and holding in

abeyance Petitioner's claim regarding the admission of his dated driver's license photo into evidence. (See Sept. 30, 2013 Memorandum & Order ("Sept. 2013 Order"), Docket Entry 18.)[4] In addition, the Court appointed counsel to represent Petitioner. (Sept. 2013 Order at 32.)

On November 2, 2015, Petitioner moved to renew his motion to vacate and set aside his sentence pursuant to N.Y. C.P.L. Art. 440, arguing that trial counsel was ineffective for failing to reopen the Wade hearing after the victim gave testimony suggesting that the lineup she participated in may have been unduly suggestive. (Pet'r's Br., Docket Entry 34-1, at 2.) Petitioner's renewed motion was denied on March 10, 2015, (See March 10, 2015 Order ("Mar. 2015 Order") Docket Entry 34-2), and on August 21, 2015 the Appellate Division, Second Department subsequently denied Petitioner leave to appeal. (See August 21, 2015 Decision & Order ("Aug. 2015 Order") Docket Entry 34-3.)

In addition, Petitioner submitted an application for a writ of coram nobis to the Appellate Division, Second Department, arguing that Petitioner's former appellate counsel was ineffective

---

[4] In its Sept. 30. 2013 Order, the Court held in abeyance Petitioner's argument that it was an error to introduce his 2001 driver's license photo at trial. However, Petitioner does not cite to any law in further support of that argument in his supplemental brief and instead focuses on the arguments that his trial counsel and appellate counsel were ineffective. The Court therefore deems Petitioner's claim regarding the admission of his driver's license photo abandoned.

for failing to argue that Petitioner's trial counsel was ineffective. (See Pet'r's Br. at 3.) The Appellate Division denied Petitioner's application and also denied leave to appeal to the New York Court of Appeals. (See May 13, 2015 Decision & Order, Docket Entry 34-4; July 22, 2015 Order, Docket Entry 34-5.)

On September 16, 2015, the Court granted Petitioner's request to amend his Petition to assert claims for ineffective assistance of his trial counsel and ineffective assistance of appellate counsel. (Sept. 16, 2015 Minute Order, Docket Entry 33; see also Pet'r's Mot. to Amend, Docket Entry 25.) In addition, the Court directed Petitioner to file an amended Habeas Petition setting forth his remaining arguments. (See Sept. 16, 2015 Minute Order.)

On November 2, 2015, Petitioner filed a supplemental brief in further support of his Petition. (Docket Entry 34.) In his brief, Petitioner argues that he was denied effective assistance of both trial counsel and appellate counsel and asks the Court to grant his Petition on one of these basis. (Pet'r's Br., at i.)

DISCUSSION

## I. Standards of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant a writ of habeas corpus to a state prisoner when prior state adjudication of the

prisoner's case "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A state-court decision is contrary to clearly established federal law if it "applies a rule that contradicts the governing law set forth in [Supreme Court] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the Supreme] Court but reaches a different result." Brown v. Payton, 544 U.S. 133, 141, 125 S. Ct. 1432, 1434, 161 L. Ed. 2d 334 (2005). "A state-court decision involves an unreasonable application of [the Supreme] Court's clearly established precedents if the state court applies [them] to the facts in an objectively unreasonable manner." Id. Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Yarborough v. Alvarado, 541 U.S. 652, 660–61, 124 S. Ct. 2140, 2142, 158 L. Ed. 2d 938 (2004) (internal quotation marks and citation omitted). Thus, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."

<u>Harrington v. Richter</u>, 562 U.S. 86, 131 S. Ct. 770, 786-87, 178 L. Ed. 2d 624 (2011).

Although Section 2254 imposes a highly deferential standard of review, it does not require blind deference to every state court decision. Rather, "[i]f, after carefully weighing all the reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's custody . . . violates the Constitution, that independent judgment should prevail." <u>Williams v. Taylor</u>, 529 U.S. 362, 389, 120 S. Ct. 1495, 1511, 146 L. Ed. 2d 389 (2000).

II.  <u>Ineffective Assistance of Trial Counsel</u>

Petitioner first argues that he was deprived of effective assistance of counsel when Petitioner's trial counsel failed to move to reopen a <u>Wade</u> hearing after SV gave testimony at trial that contradicted testimony provided by police at the <u>Wade</u> hearing.  (Pet'r's Br. at 13.)

To prevail on a claim of ineffective assistance of counsel, petitioner "must show both that his counsel acted 'outside the wide range of professionally competent assistance,' and that the deficiencies in his counsel's performance were prejudicial to his defense." <u>Jameson v. Coughlin</u>, 22 F.3d 427, 429 (2d Cir. 1994) (quoting <u>Strickland v. Washington</u>, 466 U.S. 668, 690, 691-92, 104 S. Ct. 2052, 2065, 2066-67, 80 L. Ed. 2d 674 (1984)).  In evaluating whether an attorney's representation fell "below an objective

standard of reasonableness," a court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." <u>Strickland</u>, 466 U.S. at 688-89, 104 S. Ct. at 2064-65. "Counsel has a duty to make reasonable investigations or make a reasonable decision that makes particular investigations unnecessary." <u>Id.</u> 466 U.S. at 691, 104 S. Ct. at 2066.

The second prong of the <u>Strickland</u> test requires that any deficiencies in counsel's performance be prejudicial to the defense. <u>See</u> <u>Strickland</u>, 466 U.S. at 692, 104 S. Ct. at 2067. While a finding of prejudice is not dependent upon a showing "that counsel's deficient conduct more likely than not altered the outcome in the case," the petitioner nevertheless must establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> 466 U.S. at 693-94, 104 S. Ct. 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Bunkley v. Meachum</u>, 68 F.3d 1518, 1521 (2d Cir. 1995).

However, it is well established that counsel need not raise every non-frivolous issue simply because a client suggests it "if counsel, as a matter of professional judgment, decides not to present those points." <u>Jones v. Barnes</u>, 463 U.S. 745, 751, 103 S. Ct. 3308, 3312, 77 L. Ed. 2d 987 (1983); <u>see</u> <u>also</u> <u>Abdurrahman</u>

v. Henderson, 897 F.2d 71, 74 (2d Cir. 1990). Further, there is a strong presumption that counsel used "'reasonable professional assistance'" and conducted himself accordingly. See Clark v. Stinson, 214 F.3d 315, 321 (2d Cir. 2000) (quoting Strickland, 466 U.S. at 689). However, "a petitioner may establish constitutionally inadequate performance if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994).

In this case, Petitioner claims he was deprived of effective assistance of counsel when his trial counsel did not move to reopen the Wade hearing after SV testified at trial that she was told by the police, prior to viewing two lineups, that "[t]here are going to be five men standing[,] [a]nd you are going to have to pick one." (Pet'r's Br. at 13.) Specifically, Petitioner claims that the detective's instruction rendered the lineups overly suggestive. (Pet'r's Br. at 13.)

Under N.Y. C.P.L § 710.40(4), the trial court has the discretion to re-open a suppression hearing if the defendant proffers new facts, which are pertinent to the suppression issue, and which "could not have [been] discovered with reasonable diligence before the determination of the motion." N.Y. C.P.L. § 710.40(4); People v. Velez, 39 A.D.3d 38, 42, 829 N.Y.S.2d 209, 212 (2d Dep't 2007); People v. Clark, 88 N.Y.2d 552, 555, 670

N.E.2d 980, 981, 647 N.Y.S.2d 479 (N.Y. 1996) (The statute requires
that the new "facts asserted be 'pertinent' to the issue of
official suggestiveness such that they would materially affect or
have affected the earlier Wade determination.")  In Velez, for
example, it was determined that the court should have re-opened a
suppression hearing when trial testimony regarding the sequence of
events leading to the defendant's arrest ran contrary to testimony
provided by police at the suppression hearing.  Velez, 39 A.D.3d
at 44, 829 N.Y.S.2d at 213.  The Second Department found that
because the officers' credibility was called into question, the
trial court should have revisited the suppression issue.  Id.

        Here, just like in Velez, defense counsel could have
moved to reopen the suppression hearing based upon SV's
inconsistent account of the instructions she received from
Detective Brittelli at the suppression hearing.  Courts in New
York have held that trial testimony that contradicts the factual
account given by police at a suppression hearing provides grounds
to reopen the hearing under N.Y. C.P.L § 710.40(4).  See People v.
Villanova, 179 A.D.2d 381, 381, 578 N.Y.S.2d 151, 152 (1st Dep't
1992) (holding that the trial court erred in denying the
defendant's request to reopen a Wade hearing when the complainant
and his friend testified, contrary to the police officer's account,
that they were "escorted to the scene of the show-up by other
police officers in order to identify individuals who had been

apprehended.")  Moreover, at least one court has explained that
"there is no discernable strategic justification for counsel's
failure to move to reopen a Wade hearing."  Maldonado v. Burge,
697 F. Supp. 2d 516, 542 (S.D.N.Y. 2010).  However, even if the
defense attorney's decision not to reopen the Wade hearing in this
case based upon SV's inconsistent testimony was unreasonable, such
a determination would only satisfy the first prong of the
Strickland test.

     In order to satisfy the second prong of the Strickland
analysis, Petitioner must present evidence that he was likely to
succeed at the suppression hearing and that "but for counsel's
unprofessional errors, the result of the proceeding would have
been different."  Strickland, 466 U.S. at 694, 104 S. Ct. at 2068;
Lynn v. Bliden, 443 F.3d 238 (2d Cir. 2006) (explaining that the
Second Circuit "has demanded some showing of the likelihood of
success at the [suppression] hearing."); Sheard v. Conway, No. 09-
CV-3603, 2010 WL 9023189, at *7 (E.D.N.Y. July 19, 2010), report
and recommendation adopted, 2012 WL 5603343 (E.D.N.Y. Nov. 15,
2012) (denying a habeas petition brought on ineffective assistance
grounds because the petitioner made "no showing that had his
attorney moved to reopen the Wade hearing, the identification would
have been suppressed").  In Saltys v. Adams, 465 F.2d 1023, 1027
(2d Cir. 1972), for example, the Second Circuit found that a
petitioner's trial counsel was ineffective for failing to object

to a highly informal identification procedure.  There, only three witnesses glimpsed the defendant's face for ten to thirty seconds. Id. at 1024.  Two of the witnesses subsequently picked out a picture of a man "resembling" the robber after examining the spread of several mugshots.  After the petitioner's photograph was identified, the two witnesses were led through a police "bullpen" and both identified the petitioner as the robber.  Id. at 1025. Holding that the petitioner was denied effective assistance of counsel, the court found that the informal procedure employed by police was overly suggestive.  Moreover, since the identification was the only evidence connecting the petitioner with the crime, counsel's failure to object to its admission was manifestly unreasonable and warranted a retrial.  Id. at 1028-29.

Unlike the slipshod identification procedure employed in Saltys, however, Petitioner has not presented sufficient evidence tending to show that the lineup undertaken in this case was overly suggestive and thus should have been suppressed.  The only evidence indicating that the lineup was overly suggestive was SV's trial testimony regarding Brittelli's statement during the lineup that "you're going to have to pick one"--indicating that a suspect was in custody and was among the men she was going to view in the lineup.  However, the New York Court of Appeals has held that "an identification is not automatically contaminated by an officer's remark that a suspect is in custody."  People v. Rodriguez, 64

N.Y.2d 738, 740, 475 N.E.2d 443, 445, 485 N.Y.S.2d 976 (1984); see also People v. Adams, 53 N.Y.2d 241, 248, 423 N.E.2d 379, 382, 440 N.Y.S.2d 902 (N.Y. 1981) (finding that a showup identification was unduly suggestive when "[t]he victims were shown only the suspects in custody after apparently being informed that they were the suspected robbers"); People v. Liggins, 159 A.D.2d 443, 444, 553 N.Y.S.2d 329, 329 (1st Dep't 1990) (holding that a "lineup was not unduly suggestive notwithstanding the comment by [the] officer that they had a suspect in custody"). Moreover, the Second Circuit has held that the existence of inconsistent statements alone is not enough to show that a petitioner's Wade argument would have been meritorious. See Lynn, 443 F.3d 238, 250 (2d Cir. 2006) (Holding that, despite "inconsistent statements" made by a witness about a photo array identification, "[t]here simply [was] no evidence in the Record regarding improper police conduct pertaining to the out-of-court identification procedures.").

Beyond Detective Brittelli's contradictory statements regarding the instructions he gave, there is a dearth of evidence tending to show the lineup was not overly suggestive. SV spent several hours with the assailant, ample time to become familiar with his facial features. She then positively identified him in a photo array and identified him again ten days later in two lineups at the police station. Thus, Petitioner has not shown that his Wade argument would have been meritorious. Petitioner's

ineffective assistance of counsel argument at the trial level must therefore be rejected.

## III. Ineffective Assistance of Appellate Counsel

In the Second Department's decision in Petitioner's direct appeal, the court noted that although appellate counsel raised the issue that the evidence at trial was insufficient to convict Petitioner, that issue was not preserved for appellate review because trial counsel did not register an objection on that ground. Schouenborg, 42 A.D.3d at 473, 840 N.Y.S.2d at 808. Nevertheless, the Second Department analyzed Petitioner's sufficiency of the evidence argument and held that "[t]he discrepancies in the complainant's prior statements to a detective and her trial testimony, and the inconsistencies between the complainant's testimony and that of the other witnesses were minor and did not render her testimony incredible or unreliable as a matter of law." Id.

Petitioner now claims that he was denied effective assistance of appellate counsel because appellate counsel did not argue that trial counsel was ineffective for failing to raise the argument that there was insufficient evidence presented to convict Petitioner.[5] (See Pet'r's Br. at 21.) This claim is now fully

---

[5] In other words, Petitioner seeks to revisit the argument that there was insufficient evidence to convict him, employing an ineffective assistance of appellate counsel argument as a

exhausted following the submission of Petitioner's unsuccessful application for a writ of coram nobis and the denial of leave to appeal issued by the New York Court of Appeals.

Just like claims for ineffective assistance of trial counsel, ineffective assistance of appellate counsel claims are evaluated using the same framework established by the Supreme Court in Strickland. See Mayo, 13 F.3d at 533 (citing Strickland, 466 U.S. at 688, 104 S. Ct. at 2064); Mabee v. Phillips, No. 05-CV-4182, 2009 WL 3644077, at *5 (S.D.N.Y. Nov. 4, 2009). Thus, to prevail on a claim of ineffective assistance of appellate counsel, the petitioner "must show both that his counsel acted 'outside the wide range of professionally competent assistance,' and that the deficiencies is his counsel's performance were prejudicial to his defense." Jameson, 22 F.3d at 429 (quoting Strickland, 466 U.S. at 668, 104 S. Ct. at 2052). To show "that appellate counsel's failure to raise a state claim constitutes deficient performance, it is not sufficient for the habeas petitioner to show merely that counsel omitted a nonfrivolous argument, for counsel does not have a duty to advance every nonfrivolous argument that could be made." Mayo, 13 F.3d at 533. Rather, a petitioner can only "establish constitutionally inadequate performance if he shows that counsel

_____

vehicle to bring the sufficiency of the evidence point before this Court.

omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker."  Id.

Petitioner's appellate counsel advanced five separate arguments in his direct appeal in this case, but neglected to include the argument that trial counsel was ineffective.  In order to show that appellate counsel was ineffective for failing to include this argument, however, Petitioner must show that there is a reasonable probability that his sufficiency of the evidence argument ultimately would have been meritorious.  See Fore v. Ercole, 594 F. Supp. 2d 281, 302-03 (E.D.N.Y. 2009).  This is the second prong of the Strickland test.  Here, however, Petitioner cannot show there was insufficient evidence presented at trial to support a guilty verdict and thus cannot show that, if raised, there was a reasonable probability that his appeal would have been successful.

A.   Sufficiency of the Evidence Inquiry

"A challenge to the sufficiency of the evidence presents the question 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  Dixon v. Miller, 293 F.3d 74, 81 (2d Cir. 2002) (quoting Jackson v. Virginia, 443 U.S. 307, 307, 99 S. Ct. 2781, 2783, 61 L. Ed. 2d 560 (1979) (emphasis in original).  Moreover, "[a] defendant challenging a conviction on sufficiency grounds bears a

heavy burden" and "[t]he reviewing court must consider the evidence in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government." United States v. Hernandez, 85 F.3d 1023, 1030 (2d Cir. 1996). The Second Circuit's decision in United States v. Anglin is instructive. In that case, the defendant was found guilty of robbing a bank and the principal evidence establishing the defendant's guilt consisted of (1) an in-court identification made by a bank teller and (2) circumstantial evidence corroborating the identification. United States v. Anglin, 169 F.3d 154, 156–59 (2d Cir. 1999). However, another bank teller who witnessed the crime could not identify the defendant in court, despite previously identifying him in a photo array. Id. at 157. The defendant challenged the sufficiency of the evidence on appeal, arguing that the bank teller who could not identify the defendant "had a better opportunity to observe the robber's face" and that there were discrepancies in the descriptions given by the two bank tellers. Id. at 159. Rejecting the defendant's argument, the Second Circuit explained that although "the discrepancies between the two tellers' descriptions . . . furnished defense counsel with legitimate arguments," those arguments were "customarily grist for the jury mill." Id. (internal quotation marks and citation omitted). Thus, the court determined that absent "a very substantial likelihood of irreparable misidentification," the

jury's verdict would not be disturbed. Id. at 160. Other courts grappling with the sufficiency of identification evidence presented to the jury have come to similar conclusions regarding the court's role in reviewing the jury's determination. See Pratt v. Upstate Corr. Facility, 413 F. Supp. 2d 228, 238 (W.D.N.Y. 2006) (holding that an "eyewitness['s] testimony alone" may be sufficient to support a conviction); People v. Jennings, 120 A.D.2d 546, 501 N.Y.S.2d 772 (1986) (explaining that "[t]he responsibility for resolving any questions relating to identification and the credibility of witnesses lies with the trier of fact"); People v. Burroughs, 127 A.D.2d 843, 843, 511 N.Y.S.2d 947, 948 (2d Dep't 1987) (finding that "[w]hile the testimony of [ ] eyewitnesses contained various inconsistencies, these discrepancies were before the triers of fact"). But see People v. Wynn, 57 A.D.2d 937, 937, 395 N.Y.S.2d 33, 34 (2d Dep't 1977) (holding that "weak [in-court] identification evidence, coupled with the fact that it took [the] complainant 20 minutes before she could identify the defendant at [a] showup" was insufficient to find the defendant guilty beyond a reasonable doubt").

During Petitioner's trial, the prosecution focused on SV's identification of Petitioner as her attacker along with circumstantial evidence corroborating SV's indemnification. SV spent several hours with Petitioner and was able to identify him in a photo array, at two lineups, and in court. In addition, the

circumstantial evidence corroborating SV's identification of her attacker consisted of: (1) SV's testimony that the assailant's name was Paul and the fact that Petitioner's middle name was Paul; (2) SV's testimony that the perpetrator told her he worked at "the Merrick pizza something" and the fact that Petitioner worked at Tomato & Basil Restaurant Pizzeria located on Merrick Road; (3) the fact that fishing gear was found in Petitioner's trunk and SV' testimony that the perpetrator told her that he "was going to go fishing"; (4) SV's identification of a bag that was removed from Petitioner's car as one that looked similar to the bag the assailant carried; (5) JP's identification of Petitioner's car as the car he rode in with the assailant; and (6) JP's testimony regarding the perpetrator's statement that he grew up in the Bronx and Petitioner's birth certificate showing that he was born in the Bronx.

During the trial, there was also conflicting testimony about a range of issues. For example, there was differing testimony about the directions that Detective Brittelli gave SV at the lineup, whether SV and JP smoked marijuana with the perpetrator, and whether JP asked SV to come with him when he left the perpetrator's vehicle. In addition, there was testimony that weighed upon SV's credibility and the reliability of her identification of Petitioner. For example, SV testified on cross-examination that the name "Terrance" was the same name as "Paul";

she testified that police told her that the perpetrator was Italian, when she previously described him as Hispanic; and there was testimony that JP could not identify Petitioner during a lineup. However, all of these issues were highlighted by the attorneys at trial and were addressed during their closing arguments. "Federal habeas courts are not free to reassess fact[-]specific credibility judgments by juries or to weigh conflicting testimony." Anderson v. Senkowski, No. 92-CV-1007, 1992 WL 225576, at *3 (E.D.N.Y. Sept. 3, 1992), aff'd, 992 F.2d 320 (2d Cir. 1993). Thus, the Court cannot draw its own conclusions about the weight the jury gave these discrepancies and how the jury reconciled them with the identification evidence and other circumstantial evidence that implicated Petitioner in the crime. Moreover, in light of the fact that SV's identification of Petitioner was corroborated by a significant amount of circumstantial evidence, the Court cannot conclude that there was "a very substantial likelihood of irreparable misidentification." Anglin, 169 F.3d at 155. Therefore, the Second Department's decision rejecting Petitioner's ineffective assistance of appellate counsel argument did not run contrary to clearly established federal law.

## CONCLUSION

For the foregoing reasons, Petitioner's motion to amend (Docket Entry 34) is FOUND TO BE MOOT and Petitioner's Habeas Petition is DENIED. In addition, since Petitioner has not made a

substantial showing of the denial of a constitutional right pursuant to 28 U.S.C. § 2253, no certificate of appealability shall issue. The Clerk of the Court is directed to mark this case CLOSED.

                              SO ORDERED.

                              /s/ JOANNA SEYBERT
                              Joanna Seybert, U.S.D.J.

Dated: June __23__, 2016
       Central Islip, New York